**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BILLINGS DIVISION**

| | |
|---|---|
| S. Dye,<br><br>    Plaintiff,<br><br>vs.<br><br>BNSF RAILWAY COMPANY, a<br>Delaware Corporation,<br><br>    Defendant. | CV-14-150-BLG-CSO<br><br><br>**ORDER GRANTING BNSF'S**<br>**MOTION FOR**<br>**SUMMARY JUDGMENT** |

## I.   Introduction

After Plaintiff S. Dye ("Dye") was discharged from her job with

Defendant BNSF Railway Company ("BNSF"), she filed this action in

state court asserting four claims under Montana law: (1) quid pro quo

sexual harassment; (2) negligent supervision; (3) negligent infliction of

emotional distress; and (4) defamation. *Cmplt. (ECF No. 4) at 4-5.*[1]

On November 21, 2014, BNSF removed the matter to this Court

asserting diversity jurisdiction under 28 U.S.C. § 1332. *Notice of*

*Removal (ECF No. 1) at 1-5.* On December 15, 2014, upon the parties'

---

[1]"ECF No." refers to the document as numbered in the Court's
Electronic Case Files. *See The Bluebook, A Uniform System of Citation,*
*§ 10.8.3.* References to page numbers are to those assigned by ECF.

written consent, this case was assigned to the undersigned for all proceedings. *Notice of Assignment (ECF No. 12)*.

Two motions are pending. First, BNSF moves for summary judgment on all claims. *BNSF's Summary Judgment Mtn. (ECF No. 39)*. Dye does not resist summary judgment in BNSF's favor on any claims except her quid pro quo sexual harassment claim. *See Dye's Resp. Br. (ECF No. 46) at 18-19* (conceding that she "does not dispute the issues raised in [BNSF's] motion" specific to her claims for negligent supervision, negligent infliction of emotional distress, and defamation).

Second, BNSF moves for sanctions – specifically dismissal of this action – for Dye's alleged failure to provide her psychological treatment records as previously ordered by the Court. *BNSF's Mtn. for Sanctions (ECF No. 42)*. Dye resists this motion and argues that dismissal is not warranted. *Dye's Resp. to Sanctions Mtn. (ECF No. 45)*.

Having considered the record and the parties' arguments, the Court will grant BNSF's summary judgment motion for the reasons discussed below. Because of this conclusion, BNSF's motion for sanctions is moot.

## II.   Background

For reasons not apparent in the record, Dye filed a Statement of Undisputed Facts in response to BNSF's motion rather than a Statement of Disputed Facts as required by Local Rule 56.1(b).  *See ECF No. 47.*  Local Rule 56.1(d) provides, in relevant part, that a "[f]ailure to file a Statement of Disputed Facts will be deemed an admission that no material facts are in dispute."  Even without application of Local Rule 56.1(d), however, the Court, after reviewing the record, concludes that no genuine issues of material fact exist that would preclude summary judgment in BNSF's favor on Dye's quid pro quo claim.

The facts that follow are undisputed unless otherwise noted:[2]

On January 17, 2011, BNSF hired Dye.  She worked as a conductor trainee and conductor at BNSF's Glendive, Montana,

_____

[2]Consistent with summary judgment standards discussed below, the following facts are taken from the materials of record.  The Court views the facts and inferences from them in the light most favorable to Dye as the non-moving party.  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 474 U.S. 574, 587-88 (1986); *Betz v. Trainer Worthham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).  Because Dye resists BNSF's motion only to the extent it is directed at her quid pro quo claim, the Court has limited this description of background facts to those relevant to that claim.

location. As a conductor in Glendive, BNSF employee Glen Greer ("Greer") at times had supervisory responsibility over Dye, although her primary supervisor was Troy Brewer, another BNSF management employee.

In a one-year period – from March 19, 2012, to March 18, 2013 – Dye was disciplined eight separate times: she received (1) four separate violations for failing to comply with BNSF's Attendance Guidelines; and (2) four separate violations for either laying off on call or missing a call altogether. On March 18, 2013, as the sole result of these reported rule violations, BNSF dismissed Dye from her employment. Dye does not challenge her discharge from employment as part of this lawsuit.

In early 2013, Dye and Greer had a brief, consensual, physical relationship. The relationship began on or about February 23, 2013, when Dye and Greer first had sexual relations. That day was the date of a retirement party for a fellow BNSF coworker, Al Koncylias. Before the retirement party, Greer had not made any promises or requests from Dye about her job, nor did Dye feel that Greer was romantically interested in her.

On February 23, 2013, Greer told Dye via text message that he was excited to get a beer after work and invited her to come to the

coworker's retirement party in Miles City. Dye informed Greer that she did not have any vacation days and that she was on call that night. Greer informed Dye that he could approve a vacation day. Dye then put in for a vacation day and Greer approved it.

Dye states that she did not put in for the vacation day so she could attend the retirement party. Instead, she put in the request "[b]ecause a supervisor said he would approve a vacation day, and I was going to take it." *Dye Deposition (ECF 41-1) at 9*. Dye then traveled to Miles City, not to go to the retirement party, but to see her friend who lived there. The drive from Glendive to Miles City was approximately 70 miles.

Both before and during her travel to Miles City, as well as upon Dye's arrival there, Dye and Greer exchanged multiple text messages. In them, Dye repeatedly expressed reluctance to go to the party because: (1) there would be people there who she did not know; (2) she could not find anyone to go with her; (3) she would be just sitting there if she went; (4) she would feel out of place; (5) she hated to walk into bars alone; (6) she did not like to do stuff like that alone; (7) she was not drunk enough to go in some place she did not know; (8) she had

never been in the bar where the retirement party was being held; and (9) she did not know anyone in Miles City who could go with her. *See ECF 41-3 at 51-55.*

Greer responded by: (1) repeatedly asking Dye to go to the retirement party; (2) telling her it would be a "calm deal" and "fun"; (3) offering to buy drinks; (4) telling her she would know him at the party; (5) telling her the other people at the party would go home early; and (6) offering to go out and walk her into the bar so that she would not have to go in the bar alone. *Id.*

Ultimately, Dye arrived at the party at the bar. Koncylias, Greer, and another railroader named "Dave" were present. When the party winded down, Dye, Greer, and Dave walked to two other bars. Dye admits that she willingly walked to the other bars with Greer and Dave because they "were all just hanging out."

After bar hopping, Dye was giving Greer a ride home when, according to Dye, Greer told her that he would help her out if she helped him out. Dye alleges that she believes that Greer meant that he would help her save her job in exchange for Dye having sex with him.

Dye and Greer then went to Dye's hotel room where they

proceeded to have sex. Dye alleges that, later that morning when she was dropping Greer off, he told her that he would write Dye a letter to help her maintain her employment with BNSF.

In text messages sent between Dye and Greer two days later – on February 25, 2013 – Dye told Greer that she "definitely had fun" with him in Miles City and that she was "more than okay to do it again."

Dye's grandfather passed away on February 13, 2013. Later that month, after being told by her supervisor, Brewer, that she could not take time off to attend her grandfather's funeral, Dye went to Greer and asked him because "[she] figured if [she] was giving him what he wanted, that he could give [her] what [she] wanted." After receiving a text message from Greer indicating that he would approve the days off, Dye texted back that he was "the best" and that "maybe [they] could hook up before [she] leave[s], parentheses, fingers crossed with a smiley face." Dye said this to Greer because she wanted to "mak[e] sure he would approve [the days off] by . . . flirting with him" and suggesting that they have sex again.

Following the February 23 retirement party, Dye and Greer exchanged extensive sexually-explicit text messages, many of a highly

graphic nature.[3]  The messages were exchanged between February 24, 2013, and March 21, 2013.  Dye alleges that some of the text messages were not sent by her, but from her phone by her friend, Abby Wilcox.  Dye noted Wilcox is uncertain which text messages she physically sent, but said that she "either sent or contributed to the content in the messages sent" on March 8, 2013.  Dye also sent Greer two naked pictures of herself.

Even after Greer's alleged agreement to assist Dye with saving her job, Dye, on more than one occasion, sent text messages to Greer indicating that she believed she was going to be fired.  For example, at one point, Dye told Greer, "I guess I'll probably be fired.  That sucks, but I will just move back to Washington."  She also told him, "I would hate to be fired, but I should have pulled it together a year ago."  Ultimately, Dye told Greer that she will either move to Washington or go back to school for nursing, and that she appreciated that he tried.  Dye says that she sent Greer these text messages referencing what she believed to be her impending termination to "get him to try harder."  Dye also explained that she "was trying to get him interested again,"

_____

[3]A spreadsheet of the text messages is part of the record.  *ECF No. 41-3 at 1-55.*  Thus, the Court will not repeat their content here.

both in her and in trying to save her job. By continuing to text Greer, Dye was trying to do whatever it took to save her job, including having sex with Greer again.

Toward the end of their relationship, Dye told Greer by text message that they "should have made a better effort" and that "her apartment is only two blocks from the depot." Greer responded by saying that they should be having sex "at least every other day," to which Dye said that she thinks about him like crazy and that she "would take any minute to be with [him]."

On March 18, 2013, Dye was dismissed from her employment with BNSF. Dye has stipulated that the termination resulted solely from her rule violations noted above. *ECF 19 at 2.*

On or about March 21, 2013, Dye and Greer had sex, at Dye's apartment, for a second and final time. Dye agrees that following her termination Greer did not "promise [her] anything[.]" Dye picked Greer up from a separate location and drove him back to her apartment, knowing that the two would engage in sexual activity. Dye drove Greer back to his vehicle after their rendezvous.

Dye believes that throughout this time she and Greer were

texting one another and engaging in sexual activity, Greer was using her and she was also using him.

Dye did not report to any BNSF supervisor or human resources department personnel that she had engaged in sexual activity with Greer and/or took part in a texting relationship with Greer until after her employment with BNSF was terminated. BNSF first became aware of a relationship between Dye and Greer on or about April 8, 2013, when Dye contacted BNSF's Montana Division Human Resources Director, Andrew Shelton, alleging that Greer had sent her inappropriate text messages and that the two of them had been involved in an intimate relationship.

Greer was terminated from his employment as a BNSF management employee on June 6, 2013, for "carrying on the relationship with Dye in violation of BNSF's Code of Conduct." *ECF No. 41-7 at 4.*

## III.  **The Parties' Arguments**

BNSF argues that there are no genuine issues of material fact and that it is entitled to summary judgment on Dye's quid pro quo sexual harassment claim. *BNSF's Opening Br. (ECF No. 40) at 14-21.*

It advances two principal arguments.

First, BNSF argues that Dye's consensual relationship with Greer was not "unwelcome" as required for an actionable sexual harassment claim. *Id. at 14-16.* BNSF argues that Dye's conduct, even when viewed in the light most favorable to her, cannot reasonably be viewed as supporting a conclusion that Greer's actions were unwelcome. *Id. at 16-19.*

Second, and in the alternative to its first argument, BNSF maintains that it is entitled to summary judgment because it exercised reasonable care to prevent and promptly correct any sexual harassment that may have occurred. *Id. at 21-27.* And, it argues, Dye unreasonably failed to avail herself of BNSF's preventive or corrective opportunities by not reporting her relationship with Greer to any BNSF supervisor or human resources representative until after her March 18, 2013 dismissal from BNSF. *Id.*

In response, Dye argues that the relationship between her and Greer was "unwelcome." *Dye's Resp. Br. (ECF No. 46) at 15.* She argues that she stated in multiple text messages to Greer that she did not want to attend the retirement party on February 23, 2013, but that

Greer "kept pressuring [her] to attend, even going so far as to repeatedly offer to buy [her] drinks if [she] went to the retirement party." *Id*. Dye maintains that "[a]fter many drinks, [she] agreed to have sexual relations with Greer in exchange for Greer's help to keep [her] employment." *Id. at 16*. She argues that she "continued to text provocative messages to Greer in the hopes that he would keep up his end of the bargain." *Id*. And, Dye argues, after her termination from BNSF, she was desperate to keep her job, so again had sex with Greer because of promises that he would write a letter on her behalf to appeal her termination. *Id*.

Second, Dye argues that BNSF is not entitled to summary judgment because it did not exercise reasonable care to prevent and promptly correct any sexual harassment. *Id. at 17*. She argues that if Greer had been properly trained and supervised, he would not have engaged in quid pro quo harassment by offering to help her keep her job in exchange for sex with him. *Id*. And, Dye argues, she did report the harassment in March 2013, but that BNSF's Code of Conduct does not indicate a time frame for reporting harassment. *Id. at 18*.

In reply, BNSF argues that it is entitled to summary judgment on

Dye's quid pro quo sexual harassment claim because: (1) Dye's response to BNSF's summary judgment motion was untimely, she did not seek an extension of time to file, she has not shown excusable neglect for her late filing, and BNSF has been prejudiced by the delay, *BNSF's Reply Br. (ECF No. 51) at 2-4*; (2) Dye has failed to raise any genuine issues of material fact about her relationship with Greer not being "unwelcome," *id. at 4-8*; and (3) BNSF has established, and Dye is unable to refute, that BNSF exercised reasonable care to prevent and correct promptly the alleged harassing behavior, and Dye failed to avail herself of the preventive and corrective opportunities BNSF provided, *id. at 10-14*.

## IV.   **Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. *Id.* at 587 (quotation omitted). In resolving a summary judgment motion, the evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citation omitted).

## V.     Discussion

The Montana Human Rights Act ("MHRA") prohibits employment discrimination based on sex. *See* MCA § 49-2-303(1). Sexual

harassment is sexual discrimination under the MHRA. *Harrison v. Chance*, 797 P.2d 200, 204 (Mont. 1990) (*citing Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). The type of discrimination claim alleged in this action – quid pro quo sexual harassment – is cognizable under the MHRA. *Williams v. Joe Lowther Ins. Agency, Inc.*, 117 P.3d 1018, 1024 (Mont. 2008) (*citing Campbell v. Garden City Plumbing and Heating*, 97 P.3d 546, 550 (Mont. 2004)).

In resolving sex discrimination claims, Montana courts are to look both to Montana's "body of case law and the federal guidelines" on sexual harassment. *Williams*, 177 P.3d at 1025 (*citing Savino v. C.P. Hall Co.*, 988 F.Supp. 1171, 1181 (N.D. Ill. 1997) (on "the quid pro quo question . . . the [Supreme] Court [has] noted that the E.E.O.C.'s Guidelines on Sexual Harassment 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'"). And, because Montana modeled the MHRA after Title VII of the Civil Rights Act of 1964, Montana courts often refer to federal case law when construing the MHRA. *See Puskas v. Pine Hills Youth Correctional Facility*, 307 P.3d 298, 303 (Mont. 2013); *Stringer-Altmaier v. Haffner*, 138 P.3d 419, 422 (Mont. 2006).

As noted in *Williams*, *supra*, the federal regulations define

actionable sexual harassment like that alleged in this action as follows:

> Unwelcome sexual advances, requests for sexual favors, and
> other verbal or physical conduct of a sexual nature
> constitute sexual harassment when (1) submission to such
> conduct is made either explicitly or implicitly a term or
> condition of an individual's employment, [and] (2)
> submission to or rejection of such conduct by an individual is
> used as the basis for employment decisions affecting such
> individual....

*Williams*, 177 P.3d at 1024 (*quoting* 29 C.F.R. § 1604.11(a)).

"The gravamen of any sexual harassment claim is that the alleged

sexual advances were 'unwelcome.'" *Meritor*, 477 U.S. at 68 (quoting 29

CFR § 1604.11(a)). Generally, the question whether particular conduct

was unwelcome presents difficult problems of proof and turns largely

on credibility determinations committed to the trier of fact. *Id*. But, as

noted above and pertinent to this motion, "if the movant shows that

there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law[,]" the Court must grant

summary judgment. Fed. R. Civ. P. 56(a). In considering the question

whether sexual advances were unwelcome, "[t]he correct inquiry is

whether [plaintiff] by her conduct indicated that the alleged sexual

advances were unwelcome, not whether her actual participation in

sexual intercourse was voluntary." *Meritor*, 477 U.S. at 68.

Here, as noted, Dye alleges that summary judgment is not warranted because her conduct supports a showing of an "unwelcome" relationship with Greer. *ECF No. 46 at 15-16.* Dye argues that: (1) after Greer invited her to their co-worker's retirement party, she told him that she was unable to go because she was on call for work; (2) Greer offered to approve a vacation day for her and then did so; (3) she stated in multiple text messages that she did not want to go to the retirement party because she did not have anyone to go with her; (4) Greer pressured her to attend, even offering to buy drinks if she did; (5) she continued to refuse to go to the retirement party by stating that she was staying home or would return home; (6) Greer continued to coax her into meeting him at the bar; and (7) Greer even went out to the bar's parking lot to walk her in when the thought of going into the bar alone was "freaking [her] out." *ECF No. 46 at 15.* She argues that, "[a]fter many drinks, [she] agreed to have sexual relations with Greer in exchange for Greer's help to keep [her] employment . . . [and] continued to text provocative messages to Greer in the hopes that he would keep up his end of the bargain." *Id. at 16.* Finally, Dye argues,

after her termination from BNSF, she was "desperate to keep her job, [so] again had sex with Greer because of promises that he would write a letter on [her] behalf for purposes of her appeal of her termination." *Id.*

The Court concludes, however, that Dye has failed to present evidence from which a reasonable juror could conclude that Greer's sexual advances were "unwelcome." Rather, evidence of Dye's own conduct indicates that she not only welcomed Greer's sexual advances, but also sought them out and encouraged them. Thus, she cannot maintain a quid pro quo sexual harassment claim. *Meritor*, 477 U.S. at 68.

First, Dye's hesitation to go to the retirement party does not raise a genuine issue of material fact respecting her claim. Dye concedes that she and Greer had a "brief, consensual, physical relationship." *ECF No. 47 at ¶ 5.* Greer's alleged offer to help her with her problems at work and their consensual sexual relationship did not begin until later in the evening – hours after the retirement party and immediately before they engaged in sex. There is no evidence, and no allegation from Dye, that Greer made any promises or requests of Dye before the retirement party.

And her hesitancy in going to the party, according to the express language in her text messages, was not because of Greer and any unwelcome sexual advances. Rather, it was because: (1) there would be people there who she did not know; (2) she could not find anyone to go with her; (3) she would be just sitting there if she went; (4) she would feel out of place; (5) she hated to walk into bars alone; (6) she did not like to do stuff like that alone; (7) she was not drunk enough to go in some place she did not know; (8) she had never been in the bar where the retirement party was being held; and (9) she did not know anyone in Miles City who could go with her. *See ECF 41-3 at 51-55.* Thus, Dye's hesitancy in attending the party has no reasonable nexus to her allegations of quid pro quo harassment that she claims occurred after the party.

Second, the evidence of record, including Dye's own admissions and testimony, demonstrates that she not only welcomed Greer's sexual advances, but also sought them out and encouraged them. For example, Dye stipulates that her relationship with Greer was "consensual." *ECF No. 17 at ¶ 6.* She told Greer on a number of occasions before the retirement party that she was interested in him.

*ECF No. 41-1 at 16 (depo. at 116; ll. 13-17)*. She chose to attend the coworker's retirement party in Miles City on February 23, 2013, at Greer's invitation, *id. at 10 (depo. at 90, ll. 5-11),* and brought Greer back to her hotel room without objection, where they had sex. *Id. at 12 (depo. at 101, ll. 8-11; 103, ll. 1-8; 106, ll. 21-23; 108, ll. 11-16)*. She gave Greer a ride home later that morning, exchanged text messages with him two days later, and told Greer that she "definitely had fun," "enjoyed [her] night," and was "more than okay to do it again." *Id. at 15 (depo. at 109, ll. 19-23); ECF No. 41-3 at 50*. Dye exchanged, without any objection, extensive, graphic, sexually-charged text messages with Greer for weeks following their February 23 rendezvous. *ECF No. 41-3 at 1-55*. She never objected, never asked him to stop, and never indicated that the messages were unwelcome when Greer sent her sexually explicit text messages, but rather responded with approval and encouragement. *Id*. In addition to sending Greer several sexually-explicit text messages describing the type of sex she wanted to engage in with him, Dye also sent Greer two naked pictures of herself. *ECF No. 41-1 (depo. at 80, ll. 23-25; 81, ll. 1-22)*. After her March 18 dismissal from employment, she repeatedly told Greer that she wanted

to meet to have sex with him. She drove to pick him up, had sex with him, dropped him back off at his car, and sent him a text message the next day telling him that she had fun the day before. *ECF No. 41-1 at 24 (depo. at 146,ll. 9-25; 147, ll. 1-4); ECF No. 46 at 10-11.* She has admitted that her relationship with Greer was welcome because they were using each other to get what they wanted, which for her meant Greer's approval of her request for time off after her other supervisor had denied her request, and Greer's help in trying to save her job in light of her eight rules violations in a one-year period. *ECF No. 41-1 (depo. at 147, ll. 12-20).* Furthermore, Dye expected that she would be dismissed, telling Greer that she would either move to Washington or go to nursing school and telling him that she appreciated that he had tried to help her. *ECF No. 46 at 10.* Dye sent the text messages to Greer to try to "get him to try harder" because she "was trying to get him interested again," both in her and in trying to save her job. *Id.* Dye argues that, by continuing to text Greer, she "was trying to do whatever it took to save her job, including having sex with Greer again." *Id.* She never asked Greer to stop texting or having a relationship with her, and never reported to any BNSF supervisor or

human resources department personnel that she was experiencing any unwelcome attention from Greer until after she was dismissed from employment. *Id. at 11-12.*

From the foregoing and other evidence of record viewed in its totality, the Court concludes that Dye has failed to raise any genuine issue of material fact respecting whether her sexual interactions with Greer were unwelcome. On the current record, it cannot reasonably be disputed that Dye's interactions with Greer were welcomed and indeed encouraged. *See, e.g., Zhao v. Kaleida Health*, 2008 WL 346205 (W.D. N.Y. Feb.7, 2008) (dismissing on summary judgment plaintiff's claim of a hostile work environment alleging a series of sexual advances culminating in sexual assault in light of emails demonstrating that sexual conduct by defendant was welcome).

As noted, Dye: (1) concedes their sexual interactions were consensual; (2) acknowledges that she was interested in Greer even before the retirement party after which they first engaged in sexual activities; (3) admits that she was using Greer to get what she wanted as much as he was using her; (4) expressly acknowledges that she was actively trying to get and keep him interested in her; and (5) admits

that she had sex with him even after BNSF discharged her from her employment. Such conduct is inconsistent with Dye's allegations of unwelcome sexual advances from Greer. The uncontroverted evidence instead shows conclusively that Dye welcomed and actively pursued Greer.

Under the undisputed facts, no reasonable juror could conclude that Dye was subjected to unwelcome sexual advances. Thus, she cannot maintain a quid pro quo sexual harassment claim, and summary judgment in BNSF's favor is appropriate.

Furthermore, even if Dye had raised genuine issues of material fact sufficient to withstand BNSF's summary judgment motion, her claim fails for an alternative reason. BNSF asserted in its Answer the so-called *Ellerth-Faragher* affirmative defense. *See BNSF's Answer (ECF No. 6) at ¶ 35*; *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). It provides that, if an employee has made out a prima facie case of sexual harassment, an employer is vicariously liable unless it demonstrates entitlement to this affirmative defense by satisfying two elements: (1) "the employer exercised reasonable care to prevent and correct

promptly any sexually harassing behavior"; and (2) the "employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *see also Stringer-Altmaier v. Haffner*, 138 P.3d 419, ¶ 26 (Mont. 2006).  Generally, these are fact-intensive determinations that a jury must make.

Here, the undisputed facts show that BNSF has satisfied the affirmative defense as a matter of law.  Respecting the first element, it is undisputed that BNSF had an anti-harassment policy – its Workplace Harassment Policy.  It included definitions, information about where to report violations, and information concerning enforcement of the policy.  *See ECF No. 41-7 at 52-54*.  Both Dye and Greer had received training on BNSF's EEO Policy and Workplace Harassment Policy in 2011.  *Id. at 2-3.*  When Dye reported Greer's alleged harassment about three weeks after she had been discharged from employment, BNSF promptly scheduled an interview with her, but her attorney cancelled the meeting.  *See Declaration of Andrew Shelton*, BNSF's Human Resources Director for its Montana Division (*ECF No. 41-7 at 3, ¶ 7*).  BNSF also contacted Greer, who

acknowledged his consensual relationship with Dye.  As noted, BNSF

subsequently terminated Greer's employment as a BNSF management

employee on June 6, 2013, for his involvement with Dye in violation of

BNSF's Code of Conduct.  *Id. at ¶ 8.*  From this undisputed evidence,

the Court concludes that BNSF exercised reasonable care to prevent

and correct promptly any sexually harassing behavior.  *See, e.g., Kohler*

*v. Inter-Tel Technologies*, 244 F.3d 1167, 1181-82 (9th Cir. 2001)

(upholding summary judgment for employer even given plaintiff's

sexual harassment allegations because employer's anti-harassment

policy established that employer exercised reasonable care to prevent

it).

Respecting the second element of the *Ellerth-Faragher* affirmative

defense, the record demonstrates that Dye received the training in

January 2011 that included the Workplace Harassment Policy.  *See*

*Shelton Declaration (ECF No. 41-7 at 2, ¶ 5 and ECF 41-7 at 58)*.  In

addition to defining quid pro quo sexual harassment, paragraph 5 of

the policy provides:

> Employees are required to report harassment <u>immediately</u>.
> Any employee who believes that a supervisor's, another
> employee's, or a non-employee's actions or words constitute
> harassment has a responsibility to report or complain about

the situation as soon as possible. Such report or complaint should be made to the employee's supervisor, Human Resources, the Office of Corporate Diversity, or the Employee Hotline at 1-800-533-BNSF.

*Id. at 53* (emphasis added).

Although Dye had received training respecting the type of harassment she alleges she endured and information about when and to whom to report such treatment, it is undisputed that she did not report Greer's alleged harassment "immediately" pursuant to the policy or even while she still worked for BNSF. Rather, she reported it about three weeks after BNSF terminated her employment. *See ECF 41-1 at 21 (depo. at 135, ll. 20-25; 136, ll. 1-5)*. From this evidence, the Court concludes that Dye failed to avail herself of any preventative or corrective opportunities provided by BNSF, and has offered no legitimate reason for her failure to do so. *Faragher*, 524 U.S. at 807; *see also Stringer-Altmaier v. Haffner*, 138 P.3d 419, ¶ 26 (Mont. 2006). Thus, the Court concludes that BNSF has satisfied the second element of the affirmative defense.

In light of the foregoing, the Court concludes that, even if Dye had presented evidence creating genuine issues of material fact sufficient to withstand BNSF's summary judgment motion, which she did not, her

claim nevertheless fails because BNSF has demonstrated, under these facts, that it is entitled to the Ellerth-Faragher affirmative defense.

In reaching this conclusion, the Court is not persuaded by Dye's arguments in opposition to BNSF's assertion of the affirmative defense. As an initial matter, Dye does not dispute availability of this defense provided BNSF satisfies both elements. And in responding to BNSF's motion, Dye does not dispute that she was trained on BNSF's anti-harassment policies, including the ways in which employees can report harassment. ECF No. 46 at 17-18. But Dye persists in her position that BNSF cannot satisfy either element of the affirmative defense.

First, Dye argues that BNSF must not have properly exercised reasonable care to prevent Greer's actions because his actions, in fact, occurred. Id. Second, she argues that BNSF's policy that addresses reporting sexual harassment does not indicate any time frame for reporting such harassment. Because she reported Greer's alleged harassment in March 2013, she argues, she did take advantage of BNSF's corrective opportunities. Id. at 18. The Court is not persuaded.

Respecting Dye's first argument, a party is not foreclosed from relying on the Ellerth-Faragher affirmative defense on the basis that harassment occurred. Rather, courts applying the defense examine the

defendant employer's anti-harassment policies and procedures precisely because harassment allegedly did occur.  *See  Kohler*, *supra*.  The Court, therefore, rejects Dye's first argument.

Respecting Dye's second argument, as noted above, undisputed evidence of record shows that Dye underwent training on January 19, 2011, that included training on BNSF's Workplace Harassment Policy and BNSF's Employee Hotline, which includes a telephone number for reporting alleged violations.  *See Shelton Declaration* (*ECF No. 41-7 at 1-4*).  As already discussed, the policy states that employees "are required to report harassment immediately."  *Id. at 53*.  In light of this undisputed evidence, Dye's argument that the policy contains no time frame for reporting harassment is unpersuasive.

For all of the foregoing reasons, the Court concludes that no genuine issues of material fact exist and that BNSF is entitled to summary judgment on Dye's quid pro quo sexual harassment claim. Because of this conclusion, the Court finds it unnecessary to address BNSF's other arguments supporting its motion.

## VI.    Conclusion

Based on the foregoing, IT IS ORDERED that BNSF's summary

judgment motion (*ECF No. 39*) is GRANTED in its entirety.  In light of this ruling,

IT IS FURTHER ORDERED that BNSF's motion for sanctions – specifically dismissal of this action – for Dye's alleged failure to provided her psychological treatment records as previously ordered by the Court (*ECF No. 42*) is MOOT.

The Clerk of Court shall enter Judgment accordingly, and close this file.

DATED this 8th day of February, 2016.

/s/ Carolyn S. Ostby
United States Magistrate Judge